## WEBBER *v.* MERRILL & a.

If one tenant in common sue alone in trespass, *qu. cl.*, and the defendant, instead of pleading the nonjoinder of the other tenant in abatement, plead to the action, the plaintiff will recover for his share of the damages.

A verdict may be lawfully returned on Sunday, if the cause have been committed to the jury before that day.

TRESPASS, *quare clausum*, and for cutting and carrying away a pine tree, of the value of twenty-five dollars. Plea, the general issue.

It appeared in evidence that John Webber, 2d, father of the plaintiff, in 1807 took a deed from O. F. Weld of about twelve hundred acres of land, in Rumney, " being all the land voted to Daniel Brainard by the proprietors of Rumney ;" that John Webber divided the land into ranges and lots, and made a plan of it, and that the trespass was committed on lot No. 6, in the 3d range ; that he marked the lines of the lots, sold sundry lots, and that he lived in Rumney till his death, in March, 1836.

That in 1826, lot No. 6 and lot No. 5, in the same range, commonly called fifty acre lots, were assessed in the non-resident list, described as " land formerly owned by John Webber, 2d, and being part of land voted to Daniel Brainard," &c. ; and in March, 1827, they were sold for the taxes, to the plaintiff, who, in March, 1828, took a deed of the same from the collector ; that these lots were taxed in 1827, 1828, and 1829, in the non-resident list, by the same description as in 1826 ; the plaintiff, then and since, residing in Boston ; that in 1830, and to 1836 inclusive, John Webber was taxed for one hundred acres unimproved land, and about an acre of arable land; and lots 5 and 6 did not appear, by any certain description, to be taxed, unless in this way ; John Webber owning no other land, but occupying the arable lot, which was owned by the plaintiff.

In 1837, and ever since, the same hundred acres were taxed as " the Aaron Webber stand, Moses Webber occupant."

Moses Webber testified that he and the plaintiff were the only children and heirs-at-law of John Webber ; that after the sale by the collector of lots 5 and 6 to the plaintiff, his father acted as the plaintiff's agent in taking care of the lots, and paying the taxes with money furnished by the plaintiff, and that since his father's death he had discharged the same duty by the plaintiff's request ; that previous to the alleged trespass he had frequently, by request of the plaintiff, been on said lots, to see if any trespasses had been committed thereon ; that in May, 1845, he had, by request of the plaintiff, assisted in running out the line between lot No. 6 and lot No. 7, in the same range, then owned by W. L. Stevens ; that Stevens was present for the same purpose,

and pointed out the corner between the lots, and went about fifty rods on the line with him and the surveyor, and made no objection to that line as being the true line between his land and the land of the plaintiff. The tenants claimed under Stevens.

John Webber lived on a part of the Brainard tract till some time in the year 1816, after which he lived near there; that he, Moses, was born in 1802, and staid with his father till he was sixteen or seventeen years old; was at home during the winter, and after that only occasionally; that his father got his wood from a portion of this Brainard tract of land while he was at home with his father, and one year his father cleared a portion of it and planted it. No part of lot No. 6 has ever been cleared. It is wholly wild land.

The tenant claimed the premises through divers *mesne* conveyances, under a deed from D. Homan to Jeremiah and John Cotton, dated August 18, 1821, recorded November 19, 1853, conveying one hundred and twenty-seven acres. The deed to Stevens was dated March 10, 1845, and recorded March 17, 1845.

The description in Homan's deed, when run out in the fall of 1845, was found to embrace a part of lots 7, 6, and 5, in the 3d range, and to cover the place of the alleged trespass; that a part thereof in lot 7 was cleared previous to the execution of the deed, and for several years afterwards, down to 1842, was occupied by Homan's grantees as a pasture.

Jeremiah Cotton testified that in 1822 he gave in to the selectmen, to be taxed, the land which he and John Cotton bought of Homan, and that he paid the taxes on it till 1842. The land so taxed to Cotton was entered in the selectmen's books, 1823 to 1829 inclusive, thus: "Lying N. W. from M. H. Chapman's, one hundred acres, and a fifty acre lot." Lot No. 6 did not lie N. W. from said Chapman's. No other possession of lot No. 6 was shown on either side.

The court instructed the jury that the defect in the records of the town of Rumney, for the year 1826, vitiated the sale by the collector; that his deed was void, and conveyed no estate; that

it gave only color of title, so that an entry under it, and adverse possession of the premises for twenty years, would create a good title ; that the plaintiff, entering under that deed upon any part of the premises, his entry was coëxtensive with the grant.

That Homan, not being shown to have been in possession, his deed to the Cottons gave only color of title, in the same way and to the same extent ; and that the possession of the· tenants' grantors would enure for their benefit.

For the purpose, in one event, of revising the ruling of the court in reference to the validity of the collector's deed, the question whether the warrant of the collector for the year 1826 was sealed, was left to the jury to find specially.

The court instructed the jury that their finding upon this question had nothing to do with the issue submitted to them, and they would find their verdict for or against the defendants, as though the warrant had no seal upon it ; because, for other reasons, the court were of opinion that the collector's deed was void.

The court further instructed the jury, that there was evidence from which it was competent for them to find that the plaintiff was sufficiently seized, so as to entitle him to recover one half of the damages proved, as an heir of said John Webber, 2d, with interest from the time the trespass was committed.

The jury, having retired and deliberated, informed the court that they had " agreed on a verdict on all the questions referred to them, except the decision of the seal on the collector's warrant for 1826 ; that there was no prospect of agreeing, and they asked to be discharged from any further trial on said seal."

The counsel for the defendants having left town, the court sent to him information of this report of the jury, with a request for him to make some suggestions in the matter, to which he replied that he had none to make ; whereupon the sheriff returned the jury into court, and the court enquired of the foreman if the jury understood that the matter of a seal on the warrant had nothing to do with the question of the plaintiff's right to recover in this action, upon which they were to pass, and the foreman

Webber *v.* Merrill.

expressing a doubt whether it might be sufficiently understood by all the jurors, the court gave to the jury the following instructions, the counsel for the defendants not being present:

" You are to consider the tax title as not made out; it is fatally defective; the collector's deed does not give a good title; it only gives color of title. When a person enters into a tract of land under color of title, his entry is supposed to be coextensive with the deed which gives the color of title. The question, whether the collector's warrant was sealed, has nothing to do with the verdict which you are to render in this case. You are not to consider the warrant at all in determining whether the defendants are or are not guilty of the trespass charged against them."

The jury then retired again, and soon returned with the same information as to a disagreement upon the question of the seal, and an agreement upon all other matters submitted to them.

The court, then, with the assent of the plaintiff's counsel, discharged the jury from the question relating to the seal, and took their verdict upon the other matters, which was a general verdict for the plaintiff for $20.08 damages.

The case was given to the jury late in the afternoon on Saturday. The jury were taken to the judge's chamber, to which place the court was adjourned, late in the evening, where further instructions were given them by the judge, and were discharged about midnight the same evening.

The defendants move to set aside the verdict, because of errors in the instructions and proceedings, and in the finding of the jury as to the amount of damages.

*H. A. Bellows,* for the plaintiff.

*Quincy,* for the defendants.

PERLEY, C. J. In 1807 John Webber took a conveyance from O. F. Weld, of twelve hundred acres of land, described in the deed as " all the land voted to Daniel Brainard by the pro-

prietors of Rumney." There is nothing in the case to show what land had been voted to Brainard by the proprietors of Rumney ; but John Webber, having this deed, entered upon a certain tract of land in Rumney and took actual possession of it, by running it out into lots, and marking the lines of the lots on the ground ; and some of the lots he afterwards sold. This was sufficient evidence for the jury to find that he claims to own the land, including lot 6 and the *locus in quo ;* and the running out of the lots and marking the lines would give him an actual possession and seizin as to third persons having no title or previous possession. *Woods* v. *Banks,* 14 N. H. 101.

There is no evidence reported tending to show that John Webber abandoned his claim and possession in lot 6, unless he surrendered and yielded it to the plaintiff after he took the tax title.

The defendants claim under a deed of one hundred and twenty-seven acres, from D. Homan to Jeremiah and John Cotton, dated in 1821. It does not appear that Homan had any title, nor what land his deed covered, unless it can be inferred that it covered the land in dispute, from the fact that in the autumn of 1845 it was run out so as to include the land in controversy ; and the case reports no evidence that the land in dispute was entered on and claimed under the deed of Homan till the autumn of 1845, and until that time no conflict appears to have arisen between the title derived under the deed of Weld to Webber, and the title derived under the deed of Homan to J. & J. Cotton.

If the title of the plaintiff under the sale for taxes was void, and he took under that deed no possession which divested the seizin of John Webber, then the evidence would well warrant the jury in finding that John Webber died seized of lot 6 ; and in that case the land would descend to his heirs-at-law, Aaron Webber, the plaintiff, and his brother Moses ; and the instruction of the court was quite correct that there was evidence from which the jury were at liberty to find that the plaintiff was entitled to recover one half of the damages proved, as one of the two

heirs at law of John Webber. Tenants in common should join in trespass *qu. cl.*, the injury in that case being to their possession, which is joint; but if one tenant in common sue alone, and the defendant, instead of pleading the nonjoinder in abatement, plead to the action, the plaintiff will recover for his share of the damages. *Addison* v. *Overend*, 6 T. R. 766.

On the other hand, the evidence that John Webber, after the plaintiff took his tax title, acted as his agent in taking charge of the land, and that Moses Webber, after his father's death, acted in the same capacity, and frequently entered by the plaintiff's request to see if trespasses had been committed, and particularly in May, 1845, before any entry under the defendant's title, went on the land to show the bounds, would be quite sufficient evidence for the jury to find that the plaintiff entered under his tax title, and became possessed of the land in dispute, claiming to own it as sole tenant. If the jury returned a verdict for the whole damage, they were well warranted in doing so by the evidence.

The court, with the assent of the parties, had directed the jury to return the special fact, whether the warrant to the collector was under seal. Having agreed on the general question of damages, the jury disagreed on the particular question referred to them. They came in and received new instructions. No complaint is made that these instructions were incorrect, and, being still unable to agree on the special fact, they were discharged from further considering that question, and merely returned the general verdict on which they had agreed previous to the new instructions. We see no reason to apprehend that the jury were misled, or that any injury was done to the defendants by the course taken in this instance.

It is, perhaps, doubtful whether, as a general thing, it is judicious to embarrass the jury with more questions and issues than are raised on the record. There is danger that their deliberations may sometimes be confused by attempting to examine too many points in the same cause. In this instance, as is always the case in our practice, the special inquiry was directed by

assent of the parties, and no private instructions were given to the jury.

The circumstance that it was not convenient for the counsel of the defendants to attend till the cause was ended, can be no ground for disturbing the verdict.

The cause having been committed to the jury on Saturday, the verdict might well be returned on Sunday, if the jury were unable to agree before. *Hoghtaling* v. *Osborne,* 15 Johns. 119 ; *Butler* v. *Kelsey,* 15 Johns. 179 ; *Heller* v. *English,* 4 Strob. 586.

*Judgment on the verdict.*